208 So.2d 788

**WATER WORKS AND SANITARY SEWER BOARD OF the CITY OF MONTGOMERY**

**v.**

**Camilla Webber NORMAN.**

**3 Div. 287.**

Supreme Court of Alabama.

Feb. 8, 1968.

Rehearing Denied April 4, 1968.

Jones, Murray, Stewart & Varner, Montgomery, for appellant.

Hill, Hill, Stovall & Carter, Montgomery, for appellee.

MERRILL, Justice.

This appeal is from a judgment of $8,000 for damages arising from the backing up of sewage in the home of appellee. A motion for a new trial was overruled on April 17, 1967, and it is from that judgment that the appeal was taken.

A party to a civil case may appeal from the ruling of the circuit court on a

motion for a new trial. Tit. 7, Sec. 764, Code 1940.

 Where the appeal is from the ruling on the motion for a new trial, that ruling is the only matter which is subject to review on appeal, and assignments of error relating to rulings in the trial itself will not be considered unless they were included in the motion for a new trial. State v. Moore, 269 Ala. 20, 110 So.2d 635; Shaw v. Knight, 212 Ala. 356, 102 So. 701. In such cases, an assignment of error that the court erred in granting or refusing to grant a new trial justifies consideration of any ground of the motion for a new trial stated with sufficient definiteness to direct this court's attention to the alleged erroneous ruling; provided such ground is adequately argued in appellant's brief. Popwell v. Shelby County, 272 Ala. 287, 130 So.2d 170, 87 A.L.R.2d 1148; Pearson v. Birmingham Transit Co., 264 Ala. 350, 87 So.2d 857.

One of appellant's assignments of error charges that the court erred in overruling the motion for a new trial and we proceed to consider those grounds of the motion which are argued in brief.

There are grounds in the motion which charge that the verdict and judgment are contrary to the evidence (No. 2), contrary to the great weight and preponderance of the evidence (No. 3), and are not supported by the evidence (No. 8). These points are raised and argued in brief.

The case was submitted to the jury on five counts—two implied contract counts, two negligence counts and a wanton count. Appellant states in brief: "There is no evidence of the existance of an implied contract or the breach thereof. Neither is there evidence of either negligence or wantonness."

On Saturday morning, November 14, 1964, Julian Norman called to his then wife, the appellee, to come into the bathroom. Raw sewage was pouring out of the toilet and bathtub. The Normans, their maid and

their yardman placed every blanket, sheet and small rug they could find to block the flow of the raw sewage into other parts of the house. Despite their attempts to contain the sewage to the bathroom, it poured out into the appellee's bedroom and hall. By this time, the sewage in the bathroom was above appellee's ankles in depth. Attempts were made to bail the sewage out of the bathroom window into the yard, but severe nausea limited this to shifts of ten minutes per person.

Appellee contacted a plumber who unscrewed the cleanout plug in the yard which relieved the pressure and allowed the sewage, not already in the house, to drain off into the yard. Most of this sewage either drained off into the road or into a vacant lot, but some of it accumulated and remained in appellee's yard. The sewage in the yard killed or burned appellee's camellia and azalea plants and they had to be replaced along with new top soil to be placed around them.

The sewage within the house saturated the wall to wall carpets and buckled and warped the mosaic hardwood floors. Appellee's bedroom, bathroom and hall had to be repainted. Every article in the house had to be washed and disinfected. It took appellee and four servants from ten days to two weeks to do this. A pest company sprayed and fumigated appellee's brand new house. The rugs had to be cleaned or replaced. Two new silk brocade chairs in the bedroom had to be reupholstered.

Appellee and her children were given diphtheria, typhoid and tetanus shots. Twenty-five dollars was spent on medicine for nausea, and a nurse had to give appellee an infusion of glucose because of her extreme vomiting. Appellee had to be confined to the hospital and was not discharged until November 20, 1964.

On October 12, 1965, raw sewage again poured into appellee's home. This second incident was repetitious of the first, except that appellee was not hospitalized the second time, but was treated by her doctor.

Appellee's home is one lot north of the intersection of Silver Lane and Croom Drive, on Croom Drive in the City of Montgomery. The flooding on each of the two occasions resulted from stoppages which occurred in the sewage main west of the manhole at the intersection of Croom Drive and Silver Lane. The sewage which backed up into appellee's home came from the sewer main which served both the Hillwood and the Walton Estates Subdivisions.

Woodrow Bamberg, a water service mechanic for the Water Works and Sanitary Sewer Board of the City of Montgomery, hereafter called appellant, testified, by deposition, that he investigated the first stoppage on November 14, 1964. He found the stoppage was caused by rags and a little grease in the sewer about one hundred feet from the manhole at the intersection of Croom Drive and Silver Lane. The rags were apparently the rotted remains of shirts. Bamberg stated that it was a mystery how the rags got in the sewer.

Eddie Rogers, another water service mechanic for appellant, unstopped the second stoppage on October 12, 1965. This stoppage was one hundred to two hundred feet from the manhole at the previously mentioned intersection and was caused by grease.

In the City of Montgomery, there are 370 to 380 miles of sewer mains and 41,000 customers are served by appellant. Barry Spratlan, an engineer for appellant, in his deposition, stated in the twelve years he had worked for appellant, there had been five instances of stoppages which had resulted in the overflow of raw sewage into a customer's home. Two of the five instances were in the home of the appellee. The appellant has only one crew for purposes of inspecting the 370 to 380 miles of sewer mains. The sewer main in question was inspected November 10, 1964, four days before the first overflow and on October 6, 1965, six days before the second overflow. No action or permanent corrective work

was done on either occasion; and appellant did nothing after either overflow of raw sewage into appellee's home to prevent a reoccurrence except to inspect the sewer mains as they had been previously doing.

The sewerage lines on Silver Lane and Croom Drive and in the area of the stoppage were each eight inch concrete mains. At the time they were built this was the minimum size sewer lines permissible under the regulations of the appellant Water Board. On July 24, 1964, before the first flooding of raw sewage into appellee's home, the regulations of the appellant Water Board were changed to a minimum size sewer line of fifteen inches. The grade of the sewer line on Silver Lane and Croom Drive was also the minimum grade for concrete lines under the appellant's regulations.

An implied contract arises where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract. Such a contract must contain all the elements of an express contract, which rests on consent, and it is to every intent and purpose an agreement between the parties, and it cannot be found to exist unless a contract status is shown. Gilbert v. Gwin-McCollum Funeral Home, 268 Ala. 372, 106 So.2d 646.

Appellant's general manager Wiley testified that the responsibility of the Water and Sewer Board is the sale of water and the collection of sewage; that the sale of water includes the handling of the sewage, except for industries, not here applicable. A customer is required to purchase water at the going rate as a privilege of tapping onto the sewer line; the board handles the sewage without additional charge other than the payment for the water, and by reason of the water charge, the board handles sewage from the house. This state of facts affords ample room for the finding that when appellee bought and paid for water, and by reason of this, was allowed to connect to the sewer line, there was an implied contractual obligation to remove the sewage.

■ We think we have already stated facts to support the finding of negligence.

■ When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court. Alabama Power Co. v. Irwin, 260 Ala. 673, 72 So.2d 300.

The wanton count related only to the second flooding of appellee's home on October 12, 1965.

■ Wantonness has been defined as a conscious doing of some act or omission of some duty under knowledge of existing conditions and conscious that from the doing of such act or omission of such duty injury will likely or probably result. Before a party can be said to be guilty of wanton conduct it must be shown that with reckless indifference to the consequences he consciously and intentionally did some wrongful act or omitted some known duty which produced the injury. Barnes v. Haney, 280 Ala. 39, 189 So.2d 779; Graves v. Wildsmith, 278 Ala. 228, 177 So.2d 448.

■ What constitutes wanton conduct depends upon the facts in each particular case. Barnes v. Haney, supra. Here, appellant was completely aware of the inadequacies of the sewer and appellant took no corrective action. Appellant owed appellee a duty, omitted to perform that duty, and the injury to appellee which appellant knew had resulted, would probably result again, and did result.

■ The ground of the motion that the verdict of the jury is contrary to the law and the evidence presents no other question than a consideration of the evidence to see if allowing all reasonable presumptions in favor of the correctness of the verdict, the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust. State v. Boone, 276 Ala. 16, 158 So.2d 658. We have considered the evidence, and it is amply sufficient to sustain the verdict of the jury, and it does not appear wrong or unjust. The verdict will not be disturbed by this court on motion to set it aside on the ground it is contrary to the evidence, unless the evidence clearly convinces us that it is wrong and unjust. Atlantic Coast Line R. Co. v. Burkett, 207 Ala. 344, 92 So. 456.

■ Appellant's assignment of error 20 charges that the court erred in allowing the appellee to ask its general manager Wiley about appellant's liability insurance coverage. The witness Wiley was being cross-examined by appellee about what he told appellee the night of the first flooding after he suggested that she move into a motel. He was asked if he did not tell her that the Water Board was responsible and would be responsible for what had happened:

"A No, sir, I said I would check on it, that I felt that if we had any responsibility, we would take care of it completely and in the meantime, while I didn't think she should be there under those circumstances.

"Q What did you mean by you would check on it?

"A Well, we had to check with our liability and see, we didn't know at that time, I didn't know at that time what even caused the problem."

\* \* \* \* \* \*

"Q You came and checked to see whether or not your liability insurance covered it?

"MR. STEWART: We object to that. He didn't say that, and you injected the insurance.

"MR. HILL: There is no insurance, there is no insurance, and I want to es-

tablish by this witness that he told Mrs. Norman, and told those present that he would be responsible, that he had liability insurance and that would cover it, and he later determined there was no liability insurance that would cover it, and that's what, when the Water Board declined to accept responsibility.

"MR. STEWART: We didn't go into any insurance in this case, Judge.

"MR. HILL: There is no insurance.

"THE COURT: Well, he states to the jury there was no insurance."

Other excerpts from the testimony follow:

"Q (Mr. Hill) Mr. Wiley, didn't you tell Mrs. Norman that the Water Works Board had liability insurance and that their liability insurance would take care of all of her expenses?

"MR. STEWART: I object to the question.

"THE COURT: Overrule your objection.

"Q (Mr. Hill Continuing) In connection with the restoration of her house, her living expenses when she was moved out of the house, and all of the expenses that she had?

"MR. STEWART: I object again.

"THE COURT: Overrule your objection, with the understanding to the jury that there was no insurance.

"MR. HILL: There is no insurance.

"THE COURT: There is no insurance involved in this case in any form whatsoever."

＊　＊　＊　＊　＊　＊

"Q Did you, Mr. Wiley, did you tell Mrs. Norman that your liability insurance would take care of all of her expenses in connection with that house?

"MR. STEWART: We object, he's answered the question once.

"THE COURT: Well, I'll let him just answer directly, did you or didn't you?

"THE WITNESS: Tell her the liability insurance would take care of it?

"THE COURT: Yes, what he's asked you.

"THE WITNESS: No, I did not, because I called the insurance man from her house that night, and he said he would be there and check it."

It can be seen that appellant's witness first injected the insurance by stating that he had to "check with our liability and see." Appellee's attorney stated several times that there was no insurance and, based on those statements, the trial court told the jury there was no insurance and that they would not consider that feature of the case. Then counsel for appellant stated that, in all honesty, he would state that appellant did have insurance but the coverage for this incident was a serious question. The trial court again told the jury that "whether there is insurance or not shouldn't have any effect whatsoever. The case should be decided fairly and justly and impartially."

We hold that there was no reversible error in the rulings of the court for either of two reasons. First, the trial judge's continued instructions that insurance was not a feature of the case, and his instructions after counsel for defendant stated that there was insurance were, in our opinion, sufficient to eradicate any prejudicial effects of the evidence from the minds of the jury. Burnett v. Bledsoe, 276 Ala. 139, 159 So.2d 841, and cases there cited.

Secondly, the rulings of the court would not be reversible under the rule set out in Smith v. Baggett, 218 Ala. 227, 118 So. 283, where the court said:

"It is unquestionably well settled that proof that a defendant had indemnity insurance is not admissible as an independent fact, but we have had cases where it is when collateral to other

material facts or so associated with or interwoven as to be inseparable that it becomes admissible and can only be eradicated or neutralized as bearing upon the defendant's liability by a limitation upon the effect of such evidence. * * "

Finally, appellant also argues that the verdict was excessive.

 A verdict will not be disturbed as excessive where the trial court has refused to disturb the amount unless so excessive as to indicate passion, prejudice, corruption or mistake. Montgomery City Lines, Inc. v. Davis, 261 Ala. 491, 74 So.2d 923.

And we have held that the correctness of a jury's verdict is strengthened when the presiding judge refuses to grant a new trial. Gulf, Mobile & Ohio R. Co. v. Sims, 260 Ala. 258, 69 So.2d 449; Donald v. Matheny, 276 Ala. 52, 158 So.2d 909, 99 A.L.R.2d 1241. We do not think the verdict should be reversed because of excessiveness.

Affirmed.

LIVINGSTON, C. J., and SIMPSON and HARWOOD, JJ., concur.